# PAUL *v.* HESS.

PATENTS; INTERFERENCE.

1. Where the senior party to an interference is a patentee, but the junior party's application is pending when the patent is issued, no benefit will accrue to the senior party from his possession of a patent in respect to the burden of proof imposed upon his adversary; but, where the senior party relies upon his record date, the burden is upon the junior party to show reduction to practice preceding that date, or else earlier conception followed by due diligence to reduction to practice, either actual or constructive.

2. Where, in an interference, the claim of one of the parties to reduction to practice is founded on a typewriting machine having six type bars embodying the issue, and he testifies that he manipulated these bars and thereby satisfied himself of the practical mechanism of the invention, but no paper was used, and his satisfaction resulted from the operation of the bars singly, it was *held* that that was not sufficient to show actual reduction to practice.

3. Where new devices are of an old type, and the novelty resides in specific construction, it may be that practical utility may be determined without use under conditions of industry; but where the device is of a new type there is need for demonstration of utility under the conditions of practical operation.

4. An improvement in type bars of typewriters, upon the efficacy of which the successful operation of the whole machine depended, *held* not to be of that simple character which requires no test or operation in order to establish reduction to practice.

5. Where it appears in an interference case that the machine claimed as a reduction to practice by one of the parties was submitted by him to his employers, but they adopted another machine, and this proving unsatisfactory, it was withdrawn and still another machine put on the market, it was *held* that the circumstances pointed to the conclusion that the machine did not represent a complete and practical invention.

6. Long delay in making use of an invention claimed to have been reduced to practice, or in applying for a patent, tends to show that the alleged reduction to practice was nothing more than an unsatisfactory or abandoned experiment (following *Traver* v. *Brown*, 14 App. D. C. 34; *Reichenbach* v. *Kelley*, 17 App. D. C. 333, and *Latham* v. *Armat*, 17 App. D. C. 345),—especially where in the meantime the party has been engaged in prosecuting similar inventions. (Following *Fefel* v. *Stocker*, 17 App. D. C. 317.)

7. Where a party to an interference relied upon the constructive reduction to practice established by his application and upon diligence, coupling this with an earlier conception, and claimed in excuse for delay in filing his application that he could not come to terms with the company at whose expense the invention had been made, it was *held* that this excuse was insufficient, as failing to explain why an understanding could not have been reached earlier, or why the company did not file the application or allow the party to protect the invention himself.

8. Where the excuse given for the delay in filing an application for a patent was the impossibility of reaching an agreement with employers concerning the invention, it was *held* that the excuse was insufficient.

No. 262. Patent Appeals. Submitted November 11, 1904. Decided January 3, 1905.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. H. C. Lord, Mr. A. P. Greeley,* and *Mr. C. L. Sturtevant* for the appellant.

*Mr. E. C. Davidson* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference case involving priority of invention of an improvement in typewriting machines as disclosed in the four counts of the following issue:

"1. In a front-strike typewriting machine, the combination of a pivoted type bar arranged below the platen and normally lying toward the front of the machine; a flexing connection disposed below said type bar, one end being connected to the type bar, and the opposite end secured to a point arranged in front of the type-bar pivot, said opposite end being arranged to swing about said fixed point with a movement entirely pivotal when said connection is flexed; the means applied upon the flexing connection intermediate its ends for flexing it to actuate the type bar, the distance between the point of flexure and connection with the type bar being greater than the distance between the point of flexure and the fixed point.

"2. In a front-strike typewriting machine, the combination of a pivoted type bar arranged below the platen, and normally lying toward the front of the machine; a flexing connection disposed below said type bar, one end being connected to the type bar, and the opposite end secured to a point arranged in front of the type-bar pivot, said opposite end being arranged to swing about said fixed point with a movement entirely pivotal when said connection is flexed; and means applied upon said flexing connection intermediate its ends for flexing it to shorten the dis-

tance between the ends of the flexing connection and to actuate
the type bar by drawing the part of the bar connected with the
flexing connection toward the fixed point, the distance between
the point of flexure and connection with the type bar being
greater than the distance between the point of flexure and the
fixed point.

"3. In a front-strike typewriting machine, the combination
of a pivoted type bar, arranged below the platen and normally
lying toward the front of the machine; a flexing connection
comprising two links connected at the point of flexure and dis-
posed below the said type bar, one end of said connection being
connected to the type bar and the opposite end secured to a fixed
point arranged in front of the type-bar pivot, said opposite end
being arranged to swing about said fixed point with a movement
entirely pivotal when said connection is flexed; the length of
the link connected with the fixed point being shorter than the
link connected to the type bar; and means acting upon said flex-
ing connection intermediate its ends for actuating the type bar.

"4. In a front-strike typewriting machine, the combination
of a pivoted type bar, arranged below the platen and normally
lying toward the front of the machine; a flexing connection
comprising two links connected at the point of flexure and dis-
posed below the said type bar, one end of said connection being
connected to the type bar and the opposite end secured to a
fixed point arranged in front of the type-bar pivot, said opposite
end being arranged to swing about said fixed point with a move-
ment entirely pivotal when said connection is flexed; and means
applied upon said flexing connection intermediate its ends for
flexing it to shorten the distance between the ends of the flexing
connection and to actuate the type bar by drawing the part of the
bar connecting the flexing connection toward the fixed point, the
distance between the point of flexure and connection with the
type bar being greater than the distance between the point of
flexure and the fixed point."

The case of the appellee, Hess, stands, both for conception
and reduction to practice, upon an application disclosing the in-
vention which was filed April 26, 1901. This application ri-

Vol. XXIV—30

pened into a patent, but no benefit accrued to him therefrom, in respect of the burden of proof imposed upon his adversary, the appellant, Paul, because the latter's application was pending at the time of the issue.    That application having been filed later, the burden was imposed upon Paul to show a reduction to practice preceding Hess's date, or else an earlier conception followed up with due diligence to reduction to practice, either actual or constructive.

The tribunals of the Patent Office agreed on the sufficiency of Paul's proof to show a conception of the invention about August 1, 1899, but, all concurring, denied his reduction to practice as well as diligence in reduction thereafter.

From the final decision of the Commissioner awarding priority to Hess, Paul has prosecuted this appeal.

The claim of actual reduction to practice is founded on a model constructed October 18, 1899, which has been made an exhibit in the case.

This model is a typewriting machine having in it six bars answering the description of the issue.    Paul testified that he manipulated these bars and thereby satisfied himself of the practical mechanism of his invention.    No piece of paper was used in making his test, and it is apparent that his satisfaction was derived from the operation of the bars singly when struck with the finger.    We agree with the tribunals of the Patent Office that this is not sufficient to show an actual reduction to practice.

It is true, as we have heretofore held in several cases, that some devices may be so simple and their efficacy so obvious upon mere inspection, that the construction of one of a size and form capable of practical use may well be deemed a sufficient reduction to practice without actual use or test to demonstrate its complete success and probable commercial value.    *Mason* v. *Hepburn,* 13 App. D. C. 86, 89 (case of clip for gun) ; *Lindemeyer* v. *Hoffman,* 18 App. D. C. 1 (cap for bottles) ; *Loomis* v. *Hauser,* 19 App. D. C. 401 (paper-ticket holder) ; *Couch* v. *Barnett,* 23 App. D. C. 446 (horse collar).

Bearing in mind the intended purpose and use of the new type bar under consideration, it is not of the simple character

of the inventions above mentioned.    It constitutes one of the essential parts of a typewriting machine, upon the successful operation of which, entirely supplied with the new bars, the demonstration of its efficacy depends.    This called for the application of another and different rule.    *Macdonald* v. *Edison,* 21 App. D. C. 527, 529.    And it was therefore necessary for the inventor to show that a typewriting machine supplied with the new bars had been constructed and tested sufficiently to show that it was capable of successfully performing the work for which it was intended.    As was well said by the Examiners-in-Chief:

"In a case where the new devices are of an old type, and their novelty consists in specific constructions of that old type, it may well be that their practical utility may be determined without actual use of them under conditions of industry.    But not so where, as here, the type of devices is a new type.    A type-bar-actuating mechanism of a new type, in order to be in practical form, must be one which can be operated with a light touch, and one which must act with practical promptness and certainty and with uniform and adequate force.    When it is of a new type there is need for demonstration of its practical utility, of a use of it under the conditions of industrial use, and evidence that that use demonstrated its practical operation."

Notwithstanding Paul's statement that he was satisfied with the practical success of the new bar, his action thereafter, and that of the company with which he was engaged, point to a different conclusion.    He says that he submitted it to the company, but it was not accepted and adopted.    On the other hand, the company adopted another machine called the "Improved Daugherty."    This, not giving satisfaction, was withdrawn, and another, not of the type of Paul's model, was substituted and put on the market.    Regarding these facts as negativing the claim that the exhibit represented a complete and practical invention at the time, the Commissioner proceeded to say:

"Either Paul or the company could have filed an application in the Patent Office on this machine, had they so desired, at any time after its alleged completion in October, 1899, whereas none

of the five modifications of the application in interference shows
the pin-and-slot connection used in the embodiment of the issue
in 'Paul's first machine,' and no application based on the
specific structure of this machine was filed until November 1,
1901.   Paul states that applications for patents based on 'Paul's
first machine,' and the 'Improved Daugherty' machine were
prepared for the company in March, 1900.   The application on
the 'Improved Daugherty' machine, it is stated, was filed in the
Patent Office in May, 1901, but the applications on 'Paul's first
machine' were not filed.   This indicates an abandonment of
'Paul's first machine' in favor  of the 'Improved Daugherty'
rather than a knowledge of its practicability at that time, as
argued by Paul.   Paul's unsupported statement that the ap-
plications on his machine were not filed because he and the com-
pany could not come to terms upon this invention is of little
weight.   That an application based on 'Paul's first machine'
was eventually filed November (June 25 ?) 1, 1901, is of little
significance, as the prior Paul-Hess interference had then been
declared, and the importance of establishing this machine had
become evident."

Long delay in making use of an invention claimed to have
been reduced to practice, or in applying for a patent, have al-
ways been regarded as potent circumstances tending to show
that the alleged reduction to practice was nothing more than an
unsatisfactory or abandoned experiment.   *Traver* v. *Brown,* 14
App. D. C. 34, 41; *Reichenbach* v. *Kelley,* 17 App. D. C. 333,
344; *Latham* v. *Armat,* 17 App. D. C. 345.   And this is spe-
cially the case where, in the meantime, the inventor has been
engaged in the prosecution of similar inventions (*Fefel* v.
*Stocker,* 17 App. D. C. 317, 321), or others, without reasonable
explanation, have been adopted for manufacture and commer-
cial use.

Having the benefit of conception only by the construction of
his device in October, 1899, Paul was not exercising diligence
when his rival entered the field.   While nothing was being done
to complete this invention by reduction to practice, two other

typewriting machines had been adopted and put on sale by the company.

Concurring with the Patent Office tribunals in this conclusion, also, we approve and adopt the following extract from the opinion of the Commissioner:

"Aside from business reasons, Paul could undoubtedly have caused the company to file the Pattison applications, or else have had prepared and filed an application on his own account at that time. The application on Paul's Daugherty improvement was filed during the period of delay. Paul urges in excuse of delay that he could not come to terms with the company upon this invention, and that as their employee, constructing the model and machine at their expense, it was only proper that he should refrain from applying for patents on his own account until finally convinced of the impossibility of agreement. This excuse does not attempt to explain why an understanding with the company could not have been reached sooner, either that they file the Pattison applications, or let Paul protect the invention himself. Moreover, it rests upon the bare assertion of Paul, entirely unsupported by evidence. Even if properly supported and covering the entire period of delay, this excuse would be insufficient as not of the character required. It involves mere business considerations, and not circumstances of a compelling nature. Diligence will not wait on business arrangements. *Kasson* v. *Hetherington,* 88 Off. Gaz. 1157."

Without further discussion, the decision appealed from will be affirmed. It is so ordered. The clerk will certify this decision to the Commissioner of Patents as required by law.

*Affirmed.*