### STEWART v. ROBINSON.
Patent Appeal No. 2851.

Court of Customs and Patent Appeals.
Feb. 8, 1932.

Irving U. Townsend, of Boston, Mass., for appellant.

Howson & Howson, of New York City (W. A. Smith, Jr., of Washington, D. C., W. G. Stewart, of Reading, Pa., and H. A. Howson and Hubert Howson, both of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

In this appeal we review the action of the Board of Appeals of the United States Patent Office, in reversing the decision of the Examiner of Interferences, and in awarding priority of invention in six counts of an interference to the appellee, Robinson.

The subject-matter of this interference is an attachment to a machine for the circular knitting of stockings which have tapered high splices. The tapered high splice is the familiar pointed dark area seen just above the heel on stockings. Prior to 1922 such reinforcements were commercially made only in full-fashioned or flat knit stockings. The parties to this interference invented attachments to be placed on the ordinary stocking knitting machine whereby the high splice might be knit into circular knit stockings. The full-fashioned or flat knit stocking which first contained the high splice was known as the "Pointex" stocking, and the high splice which had a pointed top was made by sewing the two edges of the flat knit stocking material together so as to form a triangle on the back of the stocking with a seam running in the center thereof from the point of the triangle downward.

The counts of the interference are illustrated by count 1, which follows:

"1. In combination with a circular knitting stocking machine, means for intermittently raising and lowering the high splicing finger of the machine and means cooperating with said means for modifying the action of said means to cause said finger to be in operation for a successively increasing period to thereby knit the high splice triangular in configuration."

The application of Robinson was filed May 16, 1921, and that of Stewart was filed August 7, 1923.

The Examiner of Interferences found that Stewart reduced the invention to practice not later than May 23, 1917, by placing his attachment (Stewart's Exhibit 6) on a knitting machine and successfully operating it to produce a stocking with a tapered high splice. He gave Robinson a date not later than November, 1920, as a date of conception, and February, 1921, as a date of reduction to practice.

The Board of Appeals did not agree with the finding of the Examiner of Interferences that Stewart had conceived and reduced to practice the subject-matter of the counts in 1917, and held that Stewart's activity at that time amounted to an abandoned experiment only. The Board also held that Stewart could not prevail because he was the last to reduce to practice and was not diligent at the time Robinson entered the field nor for a long time after Robinson had reduced to practice.

The Examiner of Interferences, having found that Stewart's Exhibit 6 showed evidence of a completed invention, held that he was entitled to priority, although he did not file his application until nearly five years after he had constructed and operated the machine. The Examiner of Interferences held that the doctrine of Mason v. Hepburn, 13 App. D. C. 86, did not apply because

appellant and those associated with him did not "purposefully" suppress the invention from public knowledge and because there was no satisfactory proof that Stewart's later activities resulted from knowledge of the work done by Robinson.

The Examiner of Interferences and the Board of Appeals discussed the evidence in great detail, and we will not attempt to state all the facts which might have bearing upon the questions involved. The record shows that Stewart, in the spring of 1917, recognizing the desirability of having a machine which would produce the pointed high splice on a circular knit stocking, set about to produce such a machine. His attachment, which was composed of cams and levers that operated a knitting finger which brought about, at a predetermined time, the knitting of a splice more particularly described hereinafter, was in operation in May of 1917.

We think the proof conclusively shows that this machine would not knit the high splice in such form as was desired or regarded as commercially suitable by Stewart and his company. The record shows that it produced a splice with the top part of the triangle flat. The width of the flat top depended on the size thread used. Stewart admits the width of the flat top was three-quarters of an inch. There is considerable evidence by Stewart's own witnesses that the machine was not so perfected, but that, when this point was reached in knitting the high splice, the necessary point for filling out the pointed triangle would appear on the front part of the stocking just above the instep. It is obvious that this splice was not satisfactory and that a sharper pointed splice was desired. Some of the witnesses of appellant testified that stockings were made on this machine and displayed in their plant. These stockings, if so made and displayed, were not introduced in evidence, and we are not satisfied that the machine produced a stocking which had the sharp pointed high splice which was desired.

Stewart in 1917 took the attachment off the machine and put it into or on a junk box or tool box underneath his desk where odds and ends were placed. It remained there for about five years. There is no record of any one having seen this attachment during that period of time. Certain letters between certain interested parties, throwing some light on the question of market conditions and on the question of Stewart's being stimulated into activity, were introduced, but we do not think it necessary to further refer to them.

Stewart's contention here is that he had successfully conceived and reduced the invention to practice in 1917, and that his delay in getting into the Patent Office should not be regarded as raising the presumption that his early activities amounted to an abandoned experiment, because he claims that the record shows abundant excuse for the long delay. He points to the fact that there was no market for the attachment or for the goods that it made, and that it was desirable to bring out in the same machine a lace formation attachment upon which he was then working, and also that at that time there was a depression following the World War which affected the market of the product of the machine, and it is furthermore suggested that there was no little uncertainty as to the existing patent situation in this particular art.

Late in 1922 or early in 1923, after Stewart had "resurrected" his device, he constructed and placed upon the same a pivoted filler lever, spring, and pin, and when so improved the same would make the sharp-pointed high splice which he desired. The new device was introduced in evidence as Stewart's Exhibit No. 11, but the date of its construction was long after Robinson had his machine in successful operation.

The record shows that between 1917 and 1922 Stewart, and the company with which he was associated, made applications for and secured patents on several inventions relating to the stocking making industry.

Concerning Stewart's "resurrection" of his high splice attachment, and concerning further steps of the parties, the Board said (record citations omitted in quotation):

"Concerning the reason for the resurrection of the Stewart high splice attachment in 1922 and the possibility of Stewart's assignee company having been stimulated into activity by knowledge of the entry of Robinson into the field, the evidence shows that samples of Robinson's tapered high splice seamless stockings were taken to a number of jobbers in New York City in July, 1921 and that in September, 1921 Robinson's Mills entered into a contract with Emery & Beers, who for years had been making full-fashioned stockings with the 'Pointex' tapered high splice, to handle the sale of the entire product of the seamless stockings from the Robinson's mill. In July, 1921 Robinson put his tapered high splice attachment on a machine received from the Hemphill Company. In October or November, 1921 ten additional machines were received from the Hemp-

hill Company. Four men from the Hemphill Company were at Robinson's mill in December, 1921 putting the machines into running order and they saw the machines running with the tapered high splice attachments. By April, 1922 Kupp had started sixty of these machines. In the month of December, 1921 the output of these stockings was 148 dozens.

"As heretofore noted, Stewart's witness Lawson testified that in 1921 and 1922 there was a strong demand for "an attachment for making the pointed heel.' Stewart and Duffy deny any direct knowledge of Robinson's machine prior to their resurrection of their Exhibit 6 machine in 1922. It seems probable, however, that they, together with other manufacturers, were aware of the activity in the art and the demand for a pointed heel attachment testified to by their witness Lawson and that this stimulated them to renew their interest and to resurrect their 1917 device.

"Not only does this evidence indicate that the 1917 device was not a complete and perfected invention but the presumption, arising from the long period in which nothing was done with it, is that it amounted to merely an abandoned experiment. This conclusion is believed to be in accord with a large number of decisions of which the following are here cited: [Here several authorities are set out, some of which are hereinafter cited and portions of the same are quoted.]"

In concluding, the Board said:

"In view of our finding that Stewart's 1917 device amounts merely to an abandoned experiment it is unnecessary to consider whether, had it been an actual reduction to practice, the doctrine of equitable estoppel as announced in Mason v. Hepburn, 1898 C. D. 510 would apply.

"In our opinion Stewart cannot prevail because he was the last to reduce to practice and admittedly was not diligent at the time Robinson entered the field or for a long time after Robinson had actually reduced to practice and had filed his application."

We agree with the Board that Stewart's 1917 device amounted to nothing more than an abandoned experiment. This being true, we concur in the conclusion of the Board that it was not necessary to consider the application of the doctrine laid down in Mason v. Hepburn, supra. Not only do we concur in the view expressed that the long period of time in which nothing was done with the 1917 machine after its production raises the presumption that it was merely an

abandoned experiment, but we think that the evidence as a whole shows that it was not a complete and perfected invention of the subject-matter of the counts at bar.

In Vanore v. Improta, 58 App. D. C. 130, 135, 25 F.(2d) 918, 923, a question quite similar to the one at bar was in issue, and the Court of Appeals of the District of Columbia, speaking through Judge Smith, said:

"The primary purpose of conferring on Congress the power to pass patent laws and to grant for a limited time patent rights to inventors was not to help or reward the inventor, but to promote the progress of science and the useful arts, for the benefit of the public and organized society. Such being the purpose of patent laws, inventors have no right, without just cause or reason, to conceal their inventions or to withhold them from the public. Inventors who do so, not only defeat in some measure the chief end to be accomplished by patent laws, but work a most serious injustice to those who later enter the field and expend their time, money, and energies in developing a conception, reducing it to practice, making it useful to the public, and in diligently prosecuting their claims to a patent.

"As against the inventor who is guilty of inexcusable delay in asserting his priority according to law, all the equities and presumptions are in favor of the inventor who, though later in conception, first files his application for a patent. An inventor may have a reasonable excuse for not promptly applying for a patent; but, if he has none, and unreasonably delays in taking the necessary steps to secure a patent, *the courts are warranted in presuming that his claim of reduction to practice was nothing better than an abandoned experiment."* [Italics ours.]

In Warner v. Smith, 13 App. D. C. 111, 115, in which Mr. Justice Morris delivered the opinion, the court was considering a similar issue. Smith, the junior party, claimed that he had conceived and reduced to practice the invention of a garment button, manufactured in part of rubber, by actually constructing such an article which could have been used and worn on the person and which to some extent could have served the purpose for which it was designed. He later laid it aside for several years. The court held that he had not reduced to practice and said:

"* * * Probably such claimant is not barred by any statute from making his claim; and if he sufficiently proves it, he and

not his competitor will be entitled to the patent; for it is to the first inventor, the first to conceive and to reduce into practice, that the law awards priority. But such conditions make it imperative upon him that he should prove his claim beyond all reasonable doubt; *and the Patent Office and the courts are justified in presuming in such cases that what is claimed to be reduction to practice is no more than mere experiment, until the contrary is clearly shown.* [Italics ours.]

"The appellee in this case, if we admit that he had the conception of this invention in the latter part of the year 1891, claims to have reduced it to practice in January of 1892, and thereafter did nothing and remained silent for three years and nine months, although there were several occasions when he might and should have spoken, if his invention was such as he now claims it to have been; and he made no movement whatever, either through the Patent Office, or otherwise, to give the public the benefit of it in any way. * * *"

In Quist v. Ostrom, 23 App. D. C. 69, 74, the Court of Appeals of the District of Columbia, in discussing the effect of years of delay in getting into the Patent Office or making use of the invented device, said:

" * * * Yet during four years they sold the old machines, made and sold improved ones, without attaching or using this effective device, or attempting to obtain a patent upon it, and even invented, patented, and manufactured another. Such conduct is irreconcilable with the idea that the experiment of 1894 had operated in such manner as to demonstrate its practical operativeness to the satisfaction of its inventor and owner."

In Moore v. Hewitt, 31 App. D. C. 577, 580, the Court of Appeals of the District of Columbia, in an opinion by Mr. Justice Robb, approved the finding of the Commissioner of Patents which was in the following language:

"The imperfect operation of the lamps made by Moore, and the fact that he did not file his application until seven years after the date when he claims to have made the invention, during which period he was active in developing other inventions, lead to the conclusion that his operations amounted to nothing more than abandoned experiments, and that he is entitled to no date of invention prior to the filing of his application."

In Curtain Supply Co. v. National Lock Washer Co., 174 F. 45, 47, the Circuit Court, N. D. Illinois, E. D., said:

"It is the settled doctrine of the Court of Appeals for the District of Columbia that when an inventor perfects and reduces to practice an invention, and fails for an unreasonable period to take steps to give it to the public, and until some one else has independently invented and patented it, the earlier inventor forfeits his rights to a patent as against the later inventor. [Many authorities were here cited.]"

Many other authorities on this subject may be cited, and the following we think are quite pertinent: Duncan v. Shelly, 49 App. D. C. 243, 263 F. 639; Bijur v. Kennington, 51 App. D. C. 230, 278 F. 313; Evans v. Richard, 36 F.(2d) 287, 17 C. C. P. A. 653; American Metal Cap Co. v. Anchor Cap & Closure Corp. (D. C.) 278 F. 670.

We conclude that Stewart's early device amounted to nothing more than an abandoned experiment, and that it was neither evidence of conception nor reduction to practice of the invention in controversy. Robinson was the first inventor of the subject-matter of the counts of interference and was properly awarded priority therein, and the decision of the Board of Appeals is affirmed.

Affirmed.