53 CCPA

**Harold R. MILLER, Appellant,**

v.

**Ronald R. HOUSE, and Yun Jen,
Appellees.**

**Patent Appeal No. 7455.**

United States Court of Customs
and Patent Appeals.

Dec. 9, 1965.

Rehearing Denied Feb. 17, 1966.

Clinton F. Miller, Wilmington, Del., (S. Grant Stewart, Wilmington, Del., of counsel) for appellant.

Evans Kahn, Stamford, Conn., for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

ALMOND, Judge.

Harold R. Miller appeals from the decision of the Board of Patent Interferences which awarded priority of invention of the subject matter at issue to the senior party, House and Jen (hereinafter House).[1] Three counts are involved; count 1 is representative and reads:

1. A process for the pulping of paper broke composed of cellulose fibers bonded together by an absorbed content of at least one wet-strength resin which comprises: slurrying said broke with a dilute aqueous solution of an inorganic oxidizing salt thereby loosening the fiber-resin-fiber bonds in said broke, and then subjecting the broke to mechanical pulping.

Broke is a waste product of the paper industry which, if not recovered and utilized, represents a substantial loss. It is customary, therefore, to repulp the broke and reuse it in the process. However, broke containing wet-strength resins proved difficult to repulp by conventional means, and it is a solution to this problem to which the invention is directed.

██ The House application was filed September 8, 1955 and issued February 3, 1959 as United States patent 2,872,313. The Miller application was filed January 28, 1960. Apparently, the original claims of the Miller application were copies of the claims in the House patent. Since Miller's filing date is subsequent to the issue date of the House patent, Miller has the burden of proving priority of invention beyond a reasonable doubt. Conner v. Joris, 241 F.2d 944, 44 CCPA 772.

██ House did not take testimony and is therefore restricted to his filing date for conception and constructive reduction to practice. Miller took testimony which concerns only his activity from July 2, 1953 to July 10, 1953. There is no showing or allegation of diligence toward a reduction to practice by Miller subsequent to July 10, 1953. The experiment upon which Miller relies for an actual reduction to practice was first carried out on July 3, 1953 and then repeated in all details on July 10, 1953 in the presence of Mr. Dieffenbach. At this time, Dieffenbach was employed by Hercules Powder Co. as a technical service representative which involved calling on paper mills in the New England area and rendering technical assistance in the use of Hercules' products and handling other problems relating to papermaking. Dieffenbach has a degree in chemical engineering and paper technology.

Both Miller and Dieffenbach testified that the details of the experiment constituting the alleged reduction to practice were as follows: Twenty grams of paper broke obtained from the Ryegate Paper Company were mixed with 50 ml. of Dazzle Bleach (a commercial product which is an aqueous solution containing 5.25% sodium hypochlorite), 0.5 g. of 98% sodium hydroxide, and 350 ml. of water. This mixture was heated to 120°F. and placed in a hot water bath. The condition of the stock was noted at intervals of 5, 10, 30, and 120 minutes. Five minutes after charging, the broke was observed to·be light yellow in color and could be partially defibered when rolled between the thumb and forefinger and suspended in water. Ten minutes after charging, the broke was pale yellow and

---

1. The real parties in interest are American Cyanamid Co., assignee of House and Jen, and Hercules Powder Co., assignee of Miller.

could be almost entirely defibered when pieces were rolled between the thumb and forefinger. Thirty minutes after charging, the broke was white and sufficiently softened to be completely defibered when rolled between the thumb and forefinger. Two hours after charging the fiber was tender, could be readily defibered by rolling between the thumb and forefinger, and could be suspended in water.

After rolling the treated samples between the fingers, Miller testified that the rolled samples were put into a test tube containing water, the test tube was then shaken, and the contents examined by holding the test tube up to the light. According to the testimony, this is a standard test to determine whether defiberization has occurred. The presence of fiber bundles or fiber clumps in the liquid suspension contained in the test tube indicates incomplete defiberization. Testing of the samples taken at 5, 10, 30 and 120-minute intervals in this manner revealed the presence of fiber bundles in the 5 and 10-minute samples only. Miller also testified that the fibers which had been treated according to the claimed process appeared to be of good length which indicated the process was not injurious to the fibers.

On the basis of the finger-rolling test and the visual appearance of the aqueous dispersion of the fibers in the test tube, Miller stated that in his opinion the process was a complete success and that he would have had no hesitation in recommending the defiberizing procedure for the repulping of broke. He further testified that he recommended to one Mr. Brunell, a Hercules technical sales representative now deceased, that if he felt it to be desirable, a mill trial should be made. However, the record before us does not show that a written report was made as to the pulping of paper broke containing a wet-strength resin or that any other activity took place as a result of this oral recommendation. In fact,

Miller testified that he did not know of any such written description or use of this process prior to 1960. He did not recommend filing a patent application at the time the experimental work was carried out because it was his opinion that the sodium hypochlorite was too costly to justify adoption of the process.

The board relied upon the following grounds for concluding that Miller had failed to sustain his burden of proving priority: (1) No evidence was presented that the alleged reduction to practice resulted in the production of a pulp for re-use. Hence, there has not been a demonstration of practical utility for the intended purpose. (2) Merely rubbing a small sample of paper between the thumb and forefinger and shaking the sample in a test tube of water does not satisfy the requirement in the count for mechanical pulping. (3) The subsequent conduct of Miller and Dieffenbach leads to the conclusion that the alleged reduction to practice amounted to no more than an abandoned experiment. (4) Dieffenbach's testimony does not constitute sufficient corroboration, particularly in view of the burden placed on Miller. Each ground will be discussed in the order given.

■■ It is well settled in interference practice that, excepting plants and designs, an invention is not reduced to practice until its practicability or utility is demonstrated. Rivise & Caesar, Interference Law and Practice, Vol. 1 (1940), § 138. The utility which must be demonstrated is that for which the claimed invention is intended. Landon v. Ginzton, 214 F.2d 160, 41 CCPA 950. When an interference count does not specify any particular use, as in the instant case, evidence proving a substantial utility for any purpose is sufficient to establish reduction to practice. Blicke v. Treves, 241 F.2d 718, 44 CCPA 753.

■ The interference counts relate to a process for pulping or defiberizing [2]

2. The following excerpt from Joint Textbook Committee, The Paper Industry of the United States and Canada, 2 Pulp & Paper Manufacture 187 (1951) supplies

paper broke containing a wet-strength resin. According to Miller's specification, " * * * the process * * * is highly effective in facilitating the defibering of wet-strength broke." This, in our view, was the intended function of the process as practiced by Miller, and it is the accomplishment of this function by the experiment of July 10, 1953 which he must demonstrate.

We believe that Miller has met this burden. According to the uncontradicted testimony, the loosening of the fiber-res-in-fiber bonds was measurably enhanced by the sodium hypochlorite treatment. A marked increase in such loosening was noted as the reaction time was extended. This was ascertained by the finger-rolling technique as well as the dispersion technique, which also permitted visual inspection of the individual fibers. There can be no reasonable doubt that, as a result of the Miller experiments on July 10, 1953, fibers were obtained from what was originally paper broke. This is all Miller need show.

The board was of the opinion that it was incumbent upon Miller to demonstrate that such fibers were capable of being reused to make paper. However, the interference counts do not contain such a limitation. Looking to Miller's specification, we find that the problem to which the invention was directed was the *defibering* of wet-strength broke, not the *preparation* of paper containing wet-strength resins.[3]

The next question to be decided is whether the finger-rolling and dispersion techniques meet the limitation in the counts for mechanical pulping. Since neither party contends the counts are ambiguous, the rule governing this issue is that the counts are to be given the broadest interpretation which they will reasonably support. Mahan v. Doumani, 333 F.2d 896, 51 CCPA 1516. In our view, rolling paper between the fingers and shaking the paper with water in a test tube meets the mechanical pulping limitation. In the context of the counts, the word "mechanical" is used in juxtaposition to the first step of the process, which is essentially chemical. Rolling paper between the thumb and forefinger and shaking the paper with water can *reasonably* be considered types of mechanical action as opposed to the chemical action of the oxidizing salt on the fiber-resin-fiber bonds.

The next question for our consideration is whether there was sufficient corroboration of Miller's testimony regarding the alleged reduction to practice. In holding that Dieffenbach's testimony was insufficient corroboration, the board did not cite any particular aspect of the alleged reduction to practice that was not testified to by Dieffenbach. Rather, it relied upon the fact that Dieffenbach testified with Miller's notebook before him together with his inability to recall the names of the persons to whom he allegedly disclosed information about the

---

background information as to the process of pulping:

2. Definitions. On the border line between pulp manufacture and beating is the process of *pulping*, otherwise known as *fiberizing*, *breaking*, or *disintegrating*. Always necessary where dry mill waste or old papers are used, and generally carried on separately where dried pulps and lapped pulps are used, this process consists in reducing the material to pulp form, with enough water of suspension to fit it for beating or refining, and sufficiently free from bunches or sheets. A fair degree of fiber separation goes with the process of pulping. The fiber thus becomes a slurry, or *slush*, and can be conveniently conveyed by pumping.

3. We note that the board apparently would agree that Miller did obtain a defibered product as a result of his alleged reduction to practice, as the following statement from the board's opinion indicates:

Here we find no evidence that the alleged reduction to practice resulted in the production of such pulp. The only test performed on the defibered product was a visual inspection of a suspension of a small amount of fibers. There is no indication in the record that the fibers from a one-half inch square of paper broke suspended in a test tube of water could be used as a pulp in the preparation of paper. * * *

process. We are not persuaded that either circumstance warrants discounting Dieffenbach's testimony. The record does not reveal that Dieffenbach was reading from the notebook. His testimony, taken as a whole, indicates a thorough familiarity with the general techniques employed by Miller as well as with the specific details of the alleged reduction to practice.

■■ There remains to consider the board's statement " * * * that the subsequent conduct of Miller and Dieffenbach leads to the conclusion that the alleged reduction to practice of July 10, 1953 amounted to no more than an abandoned experiment." The law on this subject appears rather vague in its outlines. The board cited Paul v. Hess, 24 App.D.C. 462, 1905 C.D. 610 and Bourn v. Hill, 27 App.D.C. 291, 1906 C.D. 699, for the proposition that long periods of inactivity after an alleged reduction to practice are a circumstance which tends to show that the activity is an abandoned experiment. While an inventor's conduct not amounting to an abandonment under

102(g) [4] is irrelevant once an actual reduction is established, such evidence subsequent to the alleged reduction to practice may be relevant and therefore entitled to consideration in deciding whether *in the first instance* the acts relied upon constituted an actual reduction to practice. See Bowers v. Valley, 149 F.2d 284, 32 CCPA 1039; Knowles v. Tibbets, 347 F.2d 591, 52 CCPA ——. However, as to those elements of a reduction to practice which were considered and *ruled on* by the board, we believe the evidence was sufficient to establish an actual reduction to practice. The board declined to decide whether the paper used by Miller in his experiments contained a wet-strength resin. The presence of such a resin is a material limitation in the counts and for Miller to establish an actual reduction to practice of the invention defined by the counts, he must prove beyond a reasonable doubt that the paper contained this resin. Accordingly, we remand this case for a determination of this issue.

Reversed and remanded.

---

4. An abandoned experiment is not the same as an abandonment under 35 U.S.C. § 102 (g). Apparently, neither party raised the issue of abandonment under 102(g) before the board, and it is not raised here.